We wouldn't ask you the questions if we didn't want to hear the answers. And with that, we're going to go ahead and get started today with Federal Trade Commission v. Corpay. I'm sorry to interrupt, but can you just adjust the microphone? I don't think we're picking you up so well, and I want to make sure that it's getting streamed. Thank you. Thank you. I'd like to focus this morning, if I could, on the injunctions informed consent. I'm sorry, we're still not picking you up. We're going to see if we can adjust that for you. And don't worry, we'll start your time over again. Okay, testing. Testing. Testing. Testing. Thank you very much. Let's just give us one moment to get readjusted and restart your time, and thank you for bearing with us.  All right, whenever you're ready. In the case of the Court, I'm Don Verrilli for Corpay. I'd like to focus this morning, if I could, on the injunctions informed consent. I apologize. We seem to be having some technical difficulties. We're just going to see if we can get this straightened out so that it will be on the live stream. Otherwise, we can hear you okay, but we want to be able to live stream it. Okay, I'm told that we can actually hear it. So, we can hear it. I'm getting confirmation from Florida, so they can hear it there. I think we're good. All right. May it please the Court. I'm Don Verrilli for Corpay. I'd like to focus this morning, if I could, on the injunctions informed consent provisions. Those provisions are sort of Damocles. They are quite onerous. They require us to take steps that go far beyond what Section 5 requires, and they authorize the FTC to micromanage our customer relationships. And does this go to the permanent injunction? Yes. Okay. Yes, Your Honor. And it authorizes the FTC to micromanage our customer relationships for 15 years or more. Now, as the Court knows from our briefs, we don't think any injunction is warranted because we don't think summary judgment should have been issued in this case. But even if one accepts, for purposes of argument this morning, the District Court's summary judgment finding that the company's pre-2019 express informed consent provisions violate Section 5, there's still no basis for the injunction. And that is true for three reasons. First, the injunction is not reasonably necessary to stop ongoing unlawful conduct. By the time the injunction was entered in 2023, we had for three years had implemented and been using a new informed consent procedure that does exactly what Section 5 requires. Customers have a reasonable opportunity to avoid unwanted fees by clicking on a hyperlink, looking at a prominently displayed box of their fees, and choosing whether to consent or not. The District Court did not find that approach to violate Section 5. We've given the District Court some guidance in how to resolve these issues. There's a 2018 opinion written by a judge visiting from the Sixth Circuit, Judge Gilman, and we identified several factors that the Court ought to take into consideration in resolving issues of this nature. And one of those factors is the degree of center involved and the sincerity of the defendant's assurances against future violations. When I look at the record, I don't see any assurances by Fleet Court indicating any intention to avoid any future violations of Section 5 of the Federal Trade Commission Act. That goes right to my second point, Judge Wilson, which is that this injunction cannot be justified as reasonably necessary to prevent the recurrence of the pre-19 unlawful conduct. The six factors that Your Honor has identified go to that question, whether the unlawful conduct is likely to recur. And here, I think it's quite obvious, given that the procedures that we adopted in 2020 and were using at the time of the injunction in 2023 are lawful and comply with Section 5, all the District Court had to do was order us to keep doing what we were doing. What about the existing customers who, I guess, were like maybe 18.8% of the existing customers who did not click on the terms and conditions to see what was involved? And then there were a number of customers who did click on the terms but then complained later about the fees of the existing customers. I think there might be a difference between new customers and existing customers. But when you talk about existing customers, you're talking about customers who could have been lured in under false and fraudulent pretenses based on the promises that were made and the failure to disclose certain things like all of the fees and that they wouldn't actually receive the amounts off of the, you know, the gallons that they bought. That goes to my third reason, Your Honor. And that is an argument that the injunction can be justified not on the basis of preventing likelihood of recurrence of the 2019 activity, which, just to finish my prior point, it can't because all that District Judge had to do was order us to keep doing what we were doing. With respect to that subset of customers that Your Honor has identified, just a couple of factual points and then I'll make the basic legal points if I could. The factual points, 96 plus percent of existing customers clicked on that box that said that they had agreed and they had read and agreed to the terms and conditions, including fees, and the box alerts them that the disclosure is going to be of fees. And then when they click on the hyperlink, the very first thing they see, and this you can see a reproduction of this on page 13 of our brief, it's a very large box that lists all the specific fees. So after we have 96 plus percent of the existing customer base having said that they agree, I don't think there is any justification in the record to assume that they are continuing to be charged unwanted fees. And it is 96 plus percent who clicked on that. But do they know what they're agreeing to if the information, if the things that they're agreeing to is so tiny and unreadable that you don't actually know what you're reading, which apparently is what the District Court determined. The District Court did determine that with respect to the pre-2019 disclosures, Your Honor, but I'm focused on the disclosures in the post-2019 period. And the FTC has not really challenged the The opposite, they said they weren't challenging. And if Your Honor looks at page 13 of our brief, Your Honor will see what the customer sees. It's this large box that lists in large type the specific fees that they would be charged. And a couple of other points if I could. Can I just ask, just so we're clear, really at the end of the day, what the permanent injunction is doing is enjoining you from the current practices that you're doing as opposed to the pre-2019 practices.  But the FTC did not challenge the post-2019 changes.  And I think this is quite important going to Judge Rosenbaum to your question because the argument I think that's embedded in Your Honor's question is that, well, you needed to take these extra steps to ensure that that prior customer base It's a remedial. Yeah, remedial. Here are the problems with that. First, Rule 65D, Federal Rules of Procedure, requires the District Court to state the basis for the injunction. The only basis stated is likelihood of recurrence, not remedy. Second, it's way too overbroad, if that's the rationale, because it applies to the thousands of new customers that we signed up from 2020 on. And so it obviously wasn't designed for that remedial purpose. And is there evidence in the record, I think there is, that some customers, new customers, or like the post-2019 customers, did in fact opt out of some of those fees? Yes, pre and post both. And in terms of customer complaints, after we What percentage opted out? Half of 1%, some small number, Your Honor, 96 plus, and a half percent plus stayed in. A small number didn't answer. And I can address that. We've addressed that in the briefs. I can address it if Your Honors would like. But to get to the What about the ones that didn't answer? As long as you've offered. Yeah, well, as we try to explain in our brief, and we said this to Judge Totenberg in the injunction hearing, we said we will do whatever you want with respect to those customers. But we had two options. We had to keep them on the program or cut them off. And understanding the business that we do, there are fleets of trucks all around the country. And if we cut them off, then the truck driver's credit cards aren't going to work anymore. And given that we had such a high percentage of people opting to stay in the program, and I do, in our briefs, detail the extreme efforts we made to try to contact that 3.5%. We called them multiple times. We emailed them multiple times. Nobody was trying to pull anything over on that group. We were working very hard. Well, I mean, based on the track record of this company, I think it's hard to say nobody tried to pull anything over on them. To the extent that we're talking about the 3.5%, then the injunction is vastly overbroad because it addresses the 96.5% and not just the 3.5%. So I don't think the injunction can be justified on that ground, with all due respect, Your Honor. And then in terms of what that 96.5% knew and didn't know, in addition to the clarity, I submit, of the disclosure, these customers received every month a management report. Unfortunately, none of them are in the appendix. But there is at least one that the court could find. But you have to remember also that the management reports prior to this time and the charges prior to this time didn't disclose these fees or disclose it in a total sum that hit it. And it was done that way by design. So let me ask you a question with respect to the remedial. I will be happy to answer that question, Your Honor. But with respect on the management reports, at the very end of the management reports they get each month, you know, it's all the listing of all the charges, uses of the card. And then at the bottom, just like on your phone bill, there's a list of all the other charges separately enumerated. This fee for this add-on charge, this fee for this add-on charge, this fee for this add-on charge. And then it's totaled up. It's right there at the bottom of every management report. So let me ask you a question. That figure that you keep repeating of the 96.6%, that's the amount that clicked by October 2022. But that was – but the amount that was available to the district court at the time of summary judgment was the 18.8% who still hadn't clicked. Isn't that right? I'm not sure about the answer to that, Your Honor. But I think the more important point there is that the district court did not consider the post-2019 extradition form consent practices when it found that we violated Section 5. And that's obvious in lots of ways. For one, the district court said, and this is at – But if nearly 19% of the people didn't click on it, then, I mean, doesn't your argument fall apart with respect to at least those 19%? And I do want to get back to the remedial point as well. Not at all, Your Honor. Why not? Because the district court – it wasn't the basis of the district court's ruling. The district court made no finding on summary judgment or otherwise with respect to anything about the program after 2020. Nothing. There's nothing in that order, in that summary judgment order. Actually, there is one sentence in the summary judgment order, and the sentence is that the company made no affirmative efforts to secure informed consent. That's at page 1726 of the appendix. It's just flatly wrong, and what it does is illustrate that the district court just wasn't paying any attention to the record evidence of our conduct after 2020 when we reformed the system. Another pretty strong indication of that is that prior to the separate evidentiary hearing on the injunction, the district court promulgated a series of questions in which it was quite evident from reading the questions that you didn't know what our practices were. And the whole evidentiary hearing was about our reform system. The district court didn't make any new findings of likelihood of recurrence based on what she knew after she learned what she learned in the injunction hearing. The only likelihood of recurrence finding is based strictly on the 2019 conduct, and as I said, all she had to do was order us to keep doing what we were doing. But, again, we do have these factors that go to likelihood of recurrence. And let's say we're considering this as a mootness question, for example. Voluntary cessation wouldn't necessarily get you off the hook, right? I mean, we would look at these kinds of factors as well to determine whether a case had become moot or not, and we have these similar factors that we look at as to whether there's a likelihood of recurrence of activity here. What is wrong with the district court's analysis in that respect? Well, there are two things wrong with it. One is the legal standard here is that the court needs to narrowly tailor its injunction to address proven violations and not enjoin lawful conduct unless it is necessary to do so. Right, and isn't one of the lawful conduct that is prohibited in the permanent injunction is the use of hyperlinks? Correct. I mean, and that is lawful activity that's allowed throughout the industry. Throughout all industries, frankly, Your Honor. We've cited numerous cases saying that it's a valid basis for formation of contracts, and there's a Ninth Circuit holding that is valid under Section 5 of the Act. But if I may go back, I know I'm over my time. It's okay, you're answering my question. If I may just address Your Honor's question. Yes, thank you. With respect to likelihood of recurrence. The likelihood of recurrence goes to the question of whether there can be injunctive relief, but the court also has to address the scope of the injunctive relief, and the standard I articulated before goes to the scope of injunctive relief. And our core point here is we have two with respect to Your Honor's question. The first is that the likelihood of recurrence, even if one applies the six factors, decides there is a likelihood of recurrence of the thing found unlawful, which is the pre-2019 practice, then the question is, is this remedy an overbroad remedy under the standard I just articulated with respect to the 2019 practice? I submit the answer is obviously yes, because the court could have just enjoined us to keep doing what we were doing in 2023, which would prevent the recurrence of the pre-2019 conduct. And then beyond that, I do think it's a very substantial abuse of discretion to find the likelihood of recurrence of the pre-2019 conduct without even considering the fact that we completely overhauled the system, spent millions of dollars to do so, reached out to our customers, and implemented that for two years. The SEC versus Zale case. Versus the $246 million or more that you guys collected in false and fraudulent fees. I mean, it's not really. So can I address that? Yes. There's two points to make about that. First, those numbers were sharply contested on the Senate Judgment Evidence, and the district court didn't make any findings about those amounts. That's the FTC's case. We sharply contest them. But second, it goes to a really important point. And if I could just make this, and then unless the court has any further questions, I'll stop. I think it's really important to understand what happened in this case. This case was filed in 2019. When it was filed under these provisions of the FTC Act, the FTC could still get restitution for prior violations of the Act. And if one looks at the complaint, and one looks at the FTC's summary judgment readings, they're all backward looking. It's all about they go to the start of the statute of limitations period 2014. And if one looks with respect to informed consent, it's pre-2019, not taking this later. But the court can look, though, retrospectively. We've said that pretty clear in our prior decision by Judge Gilman. And the court here uses, when the court looks retrospectively, it uses words like far-reaching and pervasive, ingrained in the fabric of the company for years. So, I mean, we're looking at the scope of the injunction for an abuse of discretion. You seem to be arguing that the court can't look retrospectively. But, I mean, our precedent is clear that the court can look retrospectively in order to enable it to decide whether or not the violations are likely to occur in the future. That's true. May I answer Judge Wilson's question and just come back? Yes, please do. Thank you. Judge Wilson, that is true. But it is equally true that the standard for an injunction, and I'm looking to this circuit's financial information tech decision, and it's 21F4 at page 1280, is that even given that retrospective analysis that Your Honor described, the injunction must be narrowly tailored to remedy proven violations, narrowly tailored to remedy proven violations, and restrain no more than necessary. And our point here is that by forcing us to go beyond, well beyond in very disruptive and onerous ways, what we were lawfully doing in 2023, that the district court violated that scope restriction. But if I could just back to the sort of overarching point here. This was an FTC restitution case, so of course it was backward looking. That's why they said they weren't challenging our current informed consent practices. They were looking to get hundreds of millions of dollars in restitution by looking at, if you see it with respect to late fees, it was all pre-2018 conduct, and we substantially changed. And then the case came out. And the case came out when summary judgment was being briefed, and they pivoted. And so you have an opinion that reads like it's a restitution case, and then at the very end, there's tacked on a likelihood of recurrence analysis that doesn't take present circumstances into account. In SEC v. Zale, Fifth Circuit case from 1981, that's binding 11th Circuit precedent, says you have to take present circumstances into account in fracturing the scope of an injunction. May I ask one question, because I'm going to ask the same question to the lawyer for the FTC. I just want to confirm that the portions that you're challenging from the permanent injunction really are the ones that go to the consent. So you're challenging the order that Fleet Corps' fee disclosures be unavoidable, right? Correct. Forbidding Fleet Corps from continuing to make disclosures via hyperlink and forbidding Fleet Corps from obtaining a cent to more than one charge through a single expression of consent. Correct. And those are all things that are post-2019. Correct. And one more thing that's important is that any future change in a fee, we can't reserve the right to increase fees based on inflation or something. Any future change, we have to go back and go through the whole consent process over again with respect to that. Those are the things that we are challenging. But just to reiterate, that's challenging on the assumption that taking as a given that district court's liability finding with respect to informed consent, we've challenged that. No, I understand. With respect to everything else as well. I understand. All right, thank you very much, Mr. Varela. You've reserved three minutes for rebuttal. Because we took you so far over, we're going to give Mr. Hoffman an extra six minutes on his time. But you've saved all of your time for rebuttal, Mr. Varela. Good morning. Can they hear me okay in Florida? I'm sure they can. Okay. May it please the Court. Fleet Court engaged in a pattern of unfair and deceptive fee practices and deceptive advertising that went on for years and cost customers hundreds of millions of dollars. I'm sorry to interrupt, but I just want to make sure that I get to some of the issues here. Sure. So Mr. Varela has said, okay, fine, but the injunction isn't justified on remedial terms. And I will tell you that part of my understanding of the injunction was that it was intended to be remedial, particularly towards existing customers who were lured in by the failure to disclose the fees and by the false and fraudulent advertising. What do you say in response to that? It was designed both to be remedial as to the existing customers who were signed up for, you know, for example, for automatically enrolled in programs that weren't disclosed, and it was also designed to prevent Fleet Court from engaging in those practices going forward. Where can we find that in the injunction order? The purpose of the injunction? That it's intended to be remedial. That finding. I'm not sure that the injunction uses the word remedial in that sense. So how do we get that from it? I mean, it's a remedial order. The Court's opinion, I think, makes very clear that there was serious harm going on to the public, that there was ongoing harm. So I disagree with Mr. Verrilli that the Court did not address that. How can you say that the order addresses ongoing harm when all the findings are about the pre-2019 conduct and there's nothing that discusses or any findings of fact about the post-2019 changes? First of all, the Court expressly found in its order that there was evidence of ongoing conduct from Fleet Court's own surveys in 2020, which found that, for example, 53% of customers who were treated felt that fees hadn't been disclosed. So that's post-2019 evidence, post-filing of the complaint. Fleet Court hasn't argued here. They didn't argue below and didn't argue in the district court that the unfair conduct wasn't occurring with respect to hidden fees, wasn't occurring past the filing of the complaint. They didn't present evidence at summary judgment of these changes in fees. They say they do. But, in fact, the only thing they point to is a piece of expert report. The expert, first of all, didn't have personal knowledge of what he was doing. In any way, that portion of the expert report was excluded. Fleet Court hasn't challenged that exclusion. So there was no evidence before the district court at summary judgment of any meaningful change. Now, Fleet Court is telling you now that, oh, everything had been fixed by 2020. But the district court heard all of that evidence. She was very engaged at the injunctive relief hearing. And she wasn't persuaded. And, you know, I think that the key legal principle that applies here, there are really three. And the first one is that this is abuse of discretion review. I'm sorry to interrupt. Let me ask you a question. I want to get back to the remedial point. I hear you be saying that the injunction order was in part remedial. Do you agree that that's part of what you're saying? I believe the injunction order is completely remedial. It's designed to prevent future misconduct. Okay. But I also hear you to be saying that it doesn't expressly say that it's remedial, but we can certainly imply that from what it's doing. Is that what you're saying? I mean, I'm not sure that the court said this is a remedial order, but that's what an injunction is. So I'm not sure why the court would say something like that. Well, I'm asking you because Mr. Verrilli is suggesting that in order for the injunction to be valid as a remedial order, the district court had to make a finding that it was intended to be remedial and that there's no such finding. And so what I'm asking you is, first of all, do you agree with Mr. Verrilli about that? And, second, if not, why not? And what is your best case? Yeah, so I would say that the ‑‑ I don't agree with Mr. Verrilli about pretty much anything on the standard for injunction. As I said, I think there are three principles that apply here. On the standard of what? I'm sorry, I didn't understand that. There are three principles that I think apply here. The first is that this is abuse of discretion review. So even if you sitting here ‑‑ Well, it could be abuse of discretion, but if the ‑‑ I mean, there's cases that, you know, reverse an entry of a permanent injunction if the district court doesn't follow proper abuse of discretion. Sure, but in this case, the district court applied the six-factor test that Judge Wilson referenced. But what is, if it's ‑‑ but under 13B, there has to be the violation is either you're violating or there is no past violations. You can't get a permanent injunction for a past violation. No, Your Honor, I believe that's incorrect. And, in fact, the Shire case on which Fleet Corps relies makes this distinction. The is or is about to language that you're referring to is in the part of the statute that goes to what the commission has to find in order to file a complaint. It's a pleading standard. And as the Third Circuit said in Shire, which is different than what other courts have said, but that's a standard that applies right out of the gate, but that at the injunctive relief stage, you apply the ordinary WT grant standard, which is likelihood of recurrence. So if there is past conduct and a likelihood of recurrence, and this is the second principle, if there is past conduct and likelihood of recurrence, the court may issue an injunction. But what is the likelihood of recurrence or what is the purpose of forbidding Fleet Corps from continuing to make disclosures via hyperlink? The reason is that there is a long history of Fleet Corps not just failing to disclose fees but affirmatively hiding fees from consumers. And what Fleet Corps wants to be able to do here is to continue hiding fees. But how can you continue hiding fees when you're using a hyperlink and the hyperlink tells you you can sign and say you want to avoid certain fees? Because the evidence is that most people never click on the hyperlink. So Fleet Corps knows that, and the reason that they want to do it by hyperlink is because they know most people aren't going to see those disclosures. Can I bring you back to the remedial question? I think you were going to tell me that you were going to tell me why it is that the injunction doesn't have to or that there doesn't have to be a finding that remedial relief is necessary, and you were going to give me some kind of authority for that position. I think the authority I was pointing to is W.T. Grant and numerous cases from this court, including the Southern Trust Metals case, which say that if there's a reasonable likelihood of recurrence, the court can issue an injunction to prevent future violations. That's the purpose of any injunction, and that's what the court did here. I think you look at the court's very detailed analysis of the likelihood of recurrence and those six factors here, you'll see that it expressly says that an injunction is necessary to prevent future violations. But that's the purpose of any injunction, and the purpose of this injunction. Right, but preventing future violations is different than being remedial. I mean, in this case, there's a very unique situation, right? We have this group of customers who were lured in through false advertising and fraudulent advertising. They were promised they were going to receive certain benefits. They didn't, and on top of that, then they got charged extra for various fees. And so the way I understood the district court injunction was with respect to these existing customers, that there was a need to do more than the standard industry of, you know, we're just updating your terms and click to see the new terms, because they had been affirmatively misled and fraudulently induced to enter these contracts. And so my question for you goes to that. Is there anything special that needs to be said or done for the court to enter the kind of injunction that is intended to remedy things that happened in the past as opposed to simply preventing future violations? I see where you're going. I don't think anything needs to be done. I don't think the court quite broke it down that way. The court applied one express and informed consent standard to both, you know, existing customers and new customers. It said going forward, you have to have express informed consent. And there is a separate section of the injunction, which is, it's Roman 6, which makes clear that you have to go back to existing customers and get express informed consent for them. So the court was focused both on making sure that we got consent from people who were already enrolled, but also establishing procedures going forward. And again, you know, the question here, I mean, going back to Judge Lagoa and hyperlinks, the question here is not whether, you know, hyperlink can ever be used or whether, you know, the legality of hyperlinks in the abstract is not an issue here. The question really is given the long history of conduct that we have here. Right, but the point of the injunction is you can only enjoin somebody for, she's making it unavoidable, right, as opposed to the disclosure practices only need to be reasonable, reasonably avoidable, not avoidable. So a couple of things there. So first of all, I think it's very clear that Fleet Court did not raise, or to the extent they did raise, they abandoned any challenge to the term unavoidable in the district court proceedings. If you look at following the injunction hearing, the FTC submitted a proposed order. Fleet Court then submitted a proposed revision to that order. They marked it up very extensively, and ultimately the judge took some things and not other things, so the order was kind of up for that compromise. But if you look at ECM page 11 or the current page 10 of that, you'll see that it's completely ambiguous in their markup. This is document 345-2, and there is no objection to the use of the word unavoidable. I mean, I think that their response, I mean, I may disagree with you on that, because I think their response to the proposed order did argue that the unavoidable, that the order was imposing something that was lawful activity. Your Honor, I mean, the judge, I don't know how the judge could have understood that they were objecting to the term unavoidable when they didn't raise that objection in their proposed order. They did object to other things. They objected to the hyperlinks and things like that. So I don't think they've raised that objection. In any event, you know, the question here is, given this history of unlawful conduct, was it an abuse of discretion for the district court to say, I don't think I'm going to allow you to do hyperlinks? An injunction is not contrary to what Mr. Verrilli has said. An injunction may prohibit lawful conduct. Injunctions do that all the time. For example, if someone engages in telemarketing violations, they may be barred from all telemarketing, even though telemarketing itself is not unlawful. And if you look at the National Lead case, which Mr. Verrilli has cited, you'll see that's very clear. That's a case where the Supreme Court said, even though a zone pricing plan is not inherently unlawful, it's not unlawful by itself, it's reasonably related to the violations, and it wasn't an abuse of discretion for the commission in that case to prohibit the use of that lawful procedure. The stimulus media case that they cite, same thing. Let me ask you this now. So the district court made a determination that the misleading fee practices were still ongoing. And so what's the best evidence of that in the record? If we were to go to the record and point to the best evidence that the misleading fee practices are still ongoing, where do we go? The district court cited a Fleet Corps study from 2020, and I think that's at, in their opinion, it's cited at Appendix 1736. That's the internal study in 2020 finding that. So that's what the court cited as evidence that the fees were ongoing. It also said Fleet Corps hadn't given, hadn't produced any evidence of changes, which it hadn't at summary judgment. So there are several studies that the district court relied upon that are in this record, right? Correct. Okay. And these are internal Fleet Corps records. Correct. I'm sorry, surveys. Correct. Okay. All right. It's an internal study over five years. Now, Mr. Verrilli, during his argument, seems to, I mean, he makes a different point than I think was emphasized in the brief, and that is that this injunction was not narrowly tailored to prevent future violations. What is your response to that? My response is that it's, the standard is reasonably related to the violations. That's from Colgate-Palmolive and National Lead, that a court won't overturn a district court's injunction unless it's not reasonably related to the underlying violations. And this clearly is. The district court heard all of this evidence of, that Mr. Verrilli is pointing to, of supposed changes in the system, and she wasn't impressed. She determined that this was what was reasonably necessary to prevent future violations. And this court has to review that under abuse of discretion, and it can only reverse if it finds that these were not reasonably related. The court applied the right standard. It had very broad discretion. Well, we could do a variety of things. I mean, you're really talking about the injunction, but there's also a summary judgment order where we could affirm the district court's findings on the different counts, or we could reverse. I mean, but it's not one, it's not a, you know, it's not affirm across the board or reverse across the board. That's true. I mean, if you were to reverse the grant of summary judgment, it would need to go back for a trial on these things. And at that point, you know, we'd see what would happen. We might be back here with the very same order. Can I ask you a question about a particular count, if I may?  So in I think count two, that's the one that deals with the fuel cards that were used to buy things other than fuel. Can you talk to me a little bit about that? Because I thought that there was some evidence in the record that showed that some of the fuel cards may have been improperly coded because there were at least 2 million transactions where a fleet court denied the use of the card for something other than fuel. Yes. That 2 million figure, which they cite in their brief, comes from an expert report. But I think if you look at that expert report, he's not specifically talking about, this is what I believe to be the case anyway, it's a little unclear. He's not talking about the MasterCard fuel cards. He's talking about 2 million decline for fuel cards overall. And he makes clear that there was, in that section, that there was less discretion with MasterCard. The same expert, and this is, let me find it. Wasn't there a piece of evidence that somebody spent $268,000 purchasing Safeway gift cards on one of these that was supposed to be for fuel only? It was more than $200,000, yes. And then another one of $44,000. Fleet court's own expert, the same one who mentioned that 2 million figure, agrees. He presents a chart showing that the cards could be used at inside service stations and that 10% of transactions were for non-fuel items. So their own expert agrees that these cards were, in fact, used for non-fuel items. And I think fleet court's internal training slides, which they haven't challenged, make that very clear. But while we're, I'm sorry, while we're on the subject, though, can you, there is one count that I don't, that I'd like you to talk about the evidence that relates specifically to Mr. Clark. And that's the count, right? The count about, that he knew, the count that would hold him liable for the idea that the fuel cards could be used to purchase only fuel when he knew that they could be used to purchase something other than fuel. And what is, what is the evidence that shows that he knew that? You know, I'm not sure of the evidence of that particular, as of that particular count. Which count, which count are we talking about? Something specifically to the fuel count. Obviously, I don't think that makes any difference to the remedy because there was certainly evidence that he knew of other, things going to the other deception counts, including, for example, the transaction fees that consumers felt they weren't getting promised discounts. But don't you have to have knowledge? What? Don't you have to have knowledge? You have to have some knowledge. And the evidence here, which he admitted in his deposition, was that he read the news reports that came out in March and April of 2017. And that he then discussed that with staff. He asked questions about it. He saw the documents. He also fielded questions from investors. So he certainly had some knowledge. And did any of that relate to the fuel, that it could be used for only fuel? As I said, I'm not sure that any of that related to, related specifically to the, to the, to the fuel card issue. I'd have to go back and check on that. And I'd be happy to submit a letter if there is. But as I said, I don't think it matters for persons with the injunction because he clearly knew about the other deceptive conduct. So the injunction would be the same regardless of whether he was, regardless of whether he had personal knowledge of or, you know, knew about the fuel card issue. I wanted to go back. Judge Legault, you had asked a question and you said that you were going to ask me the same questions. And about the particular provisions of the injunction that plea court is challenging. And I think I heard Mr. Wood say something about challenging provisions that would allow them to adjust the amount of fees without notice to customers. And that, to my knowledge, is not an argument that was made in their briefs. So I don't think that's an argument that should be considered here. As to the unavoidable language, as I've said, that argument was not preserved. Or to the extent it was made, it was very much abandoned. I don't think that Judge Totenberg could have understood reasonably that they were challenging that particular word when they didn't flag it in their extensive markup of the proposed order. And by the way, they didn't really challenge it in their previous markup either. There was a note referring to their brief, but they didn't propose striking the word. So, you know, I think that that is, there's no basis for that. As to the hyperlinks, you know, we've talked about that. What I would say is that, you know, whether or not hyperlinks are permissible in some circumstances, the district court here certainly didn't abuse discretion in restricting the use of hyperlinks, given the longstanding evidence that plea court was trying to hide fee disclosures from its clients, from its customers, and the evidence that most customers never click on the hyperlink. They won't see it. And plea court, you know, shouldn't be allowed to continue hiding fees. Thank you. Thank you. Thank you, Mr. Hoffman and Mr. Verrilli. You've got three minutes. Mr. Verrilli, earlier we were discussing the post-2019 Fleet Corps conduct. So what do we do with Fleet Corps' own internal study from 2020, finding that of individuals who stopped using Fleet Corps cards, 53% felt misled and 26% claimed fees were not accurately described or disclosed. And then there's another internal study finding that Fleet Corps' customers are often, quote, as used by the district court, fairly unsophisticated, and business owners but not business people who work in the field or drive vehicles and are, quote, short on time due to wearing multiple hats, close quote. That's, I mean. Your Honor, both of those studies, as we tried to document in our brief, pertain entirely to the conduct occurring before we revised our informed consent procedures entirely. The study occurred in 2020 looking back to pre-2020 behavior so that it has no bearing, I respectfully submit as an evidentiary matter, on the lawfulness or the effectiveness of the post-2020. And so the court can't look at prior Fleet Corps conduct in determining whether or not there is a future likelihood to mislead? The court can, of course, look at it, but this goes to the scope of the injunction. Which we review for an abuse of discretion. Under the legal standard that I articulated earlier. The standard that we have set for district judges to use by Judge Gilman's decision in 2018. I mean, in order to find an abuse of discretion, don't we have to find that the court improperly weighed the factors that we said district courts have to weigh? That's one way to find an abuse of discretion. Another way is to find that the court violated the legal standard, which says that an injunction has to be narrowly tailored and cannot inform lawful conduct unless it's necessary to do so. Now, if I could go back to the remedial point. I'd like to start with the text of Rule 65. This is Rule 65d1. It says every order granting an injunction must state the reasons why it did. This is neither the summary judgment opinion nor the injunction states that these provisions are being imposed in order to remedy that supposed deception. I submit that it is obvious that that is not the purpose of the injunction because it applies equally to all the thousands of new customers signed up after 2020. This is to prevent the recurrence, as the district court said, the recurrence of the pre-2019 conduct. Third point on that is that to the extent that the court was going to have a remedial purpose, there needed to be fact-finding of what the effect of the 2020 change was with respect to the knowledge of consumers, and there was none of that. Now, with respect to the question of whether we waived the unavoidable argument, respectfully, I argued that case in the injunction hearing in district court. I argued up and down and sideways that unavoidable was the wrong legal standard. With respect to the negotiations that my friend on the other side identified, we reserved our rights, our legal claims. So that waiver argument, frankly, has no merit at all. Is there any evidence in the record that Fleet Court implemented an affirmative disclosure process? There are reams of evidence in the record. If I could just make two points, and I'm going to go over my time. You can answer the question. I will answer the question making two points. First, there was evidence in the summary judgment record that we adopted this affirmative disclosure process. It was attached to the WIND report. My friend on the other side is incorrect. The portion of the WIND report that was excluded did not cover this issue. Attached to the what? I'm sorry? Of the WIND report, the expert report. Did not cover. The excluded part did not cover this issue. In addition, we cross-moved for summary judgment. We raised this exact issue in the cross-motion. But what's significant for purposes of our injunction argument, and this is the second half of the response to Judge Wilson, is that whether the evidence was in the record or not at the time of summary judgment is not conclusive of the question of whether the injunction was proper after the district court learned at the hearing on the injunction what we were doing. And the whole hearing, 80% of that two-day hearing, was about our practices from 2020 on. So at that point, now that the district court was apprised and there was a complete record of what we were doing, in order to force us to go beyond the lawful conduct in which we were engaging, the district court needed to make findings that given what we were doing, there was a likelihood of recurrence that required a specific injunction as opposed to the just requirements to keep doing what we were doing, and had to make findings regarding the effect of that. All right. Thank you. I think we've got your argument. Thank you both. Our next argument today...